Mr. Justice DAVIS
 

 delivered the opinion of the court.
 

 At the outset of this case we are met with the objection that there is no replication in the record; but this objection,
 
 *204
 
 on the authority of
 
 Clements
 
 v.
 
 Moore,
 

 *
 

 should have been made in the court below. Not having been made there, it will be considered as having been waived. It would work great injustice in this case to allow it to be taken here for the first time, for manifestly the submission was not on bill and answer, for proofs wore taken, and it is to be presumed, in the absence of anything in the'reeord to the contrary, that they were considered by the court in the disposition of ihe cause.
 

 So far as the answer to the bill of revivor was concerned, no formal replication was required to avoid its effect as evidence in the cause. Nothing could be brought into the litigation by the bill of revivor besides the mere question whether the brother, brought in on the bill of revivor, was the executor of the will of Stover, and his legatee and devisee, for Catharine Fretz had been made a party to the original suit before answer was made to it.
 
 †
 
 The new defences, therefore, set up in the answer to the bill of revivor, were not pertinent to it, and cannot be considered in the case.
 
 ‡
 

 Ve are brought, therefore, directly to the question whether the payments by Stover to Chilton were, under the circumstances surrounding the parties, of any validity.
 

 It is argued by the appellants that the bond ivas not left with Chilton for collection at all, but only for safe keeping until it matured; but the bill avers the fact to be otherwise, and, naturally, it must have been so. Chilton had been the attorney of Fretz and wife through a protracted and angry litigation, and, as the evidence show's, assisted at the compromise of it. This compromise was effected in February,
 
 1861,
 
 and contemplated several transactions which could not be completed until after Fretz’s return to Pennsylvania. Among these was the execution of the bond and deed of trust iu question. As Fretz could not in person see that the papers were properly drawn, he intrusted that duty to Chil
 
 *205
 
 ton, and the additional duty of having the deed recorded. It was undoubtedly expected at the time that before the bond matured Fretz would hold frequent communications with Chilton, and this may account for nothing being said on the subject of collecting the bond. There was no necessity for it, as the bond had a long time to run, and, besides, no trouble was anticipated about the collection of it. It is, however, fairly to be inferred from the relation between the parties that Chilton had authority to collect and transmit, in the absence of any specific directions on the subject. And if war had not intervened, and he had not been told to collect the bond in legal currency alone, he would have been authorized to receive payment in current bank bills which passed at their par value in business transactions at the place where the contract was to be performed. But if this rule holds good when the country is at peace and undisturbed by civil commotion, it has no application in a state of war like that of the late rebellion. That rebellion effected a change in the status of the parties to this contract, and in the relations between the appellants and Chilton. Although the country was unquiet when these parties, in February, 1861, settled their differences, yet it would be a violent presumption to suppose that they anticipated the changed condition of things which soon after occurred. They doubtless acted on the belief that the difficulties which threatened the peace of society would be adjusted, and the monetary affairs of the country remain as they were. On this theory they concluded their agreement, and Fretz repaired to his home in Pennsylvania, leaving Chilton to see that Stover performed his part of it. It may be that it was not expected that the bond which Chilton obtained from Stover would be paid in specie, but at least it was expected that it would be paid in current bank notes, redeemable on presentation at the counter of the banks issuing them. At any rate, it was executed with reference to the standard of value then existing in the United States.
 

 The war occurred, and Fretz was prohibited by the law of the government under which he lived from holding com
 
 *206
 
 muni cation with Virginia. If some persons did take the risk and cross the line in order to save their property, certainly Fretz, who did not choose to break the law and encounter the danger, cannot be held responsible for not going to Virginia and withdrawing the bond and deed of trust from the hands of Chilton. "When, in 1864, he first heard from Chilton, he was told his papers were safe and would be kept so, as nothing but Confederate money could be collected, which was valueless. And not until 1866 did he learn the truth, although after the war closed he had frequent personal interviews with Chilton. This conduct of Chilton’s shows his consciousness that he had attempted to wrong his principals and his unwillingness to disclose his culpability. But it is of no importance what he attempted to do, for his principals are not bound by his wrongful acts. If he was authorized when he received the bond to collect it when due, in bank bills which were current in Virginia at the time, this authority was conferred in ignorance of, and without reference to, the contingency of war, and in the nature of things was revoked when war broke out. The authority to collect was based on the power to remit, and •this it was impracticable, as well as unlawful, to do. Besides this, the authority to .receive bank bills at all, in the collection of debts, only rests on the theory that they pass as money at their par value by the common consent of the community, and can be used by the principal where he lives in the common transactions of life. But when this is not the case, and war has disturbed the country to that extent that the paper used in Virginia to pay debts is of no value in Pennsylvania, there is no longer any authority to take it by an agent living in Virginia in discharge of a debt due a citizen of Pennsylvania. If it were otherwise, then, as long as the war lasted, every Northern creditor of Southern men was at the mercy of the agent he had employed before the war commenced. And his condition was a hard one. Directed by his government to hold no intercourse with his agent, and therefore unable to change instructions which were not applicable to a state of war, yet he was bound by
 
 *207
 
 the acts of his agent in the collection of his debts the same as if peace prevailed. It would be a reproach to the law if creditors, without fault of their own, could be subjected to such ruinous consequences.
 

 If Chilton could not receive payment of the bond in Confederate paper and Virginia bank notes, neither had Stover the right to pay them. It was a void act on his part to attempt to discharge his debt in this way, as well as a fraud in Chilton to suffer him to do so. His obligation when the bond fell due was to pay it in the legal currency of the United States, and yet he tries to discharge it in paper worthless to Fretz, and with knowledge that, worthless as it was, it could not be sent to him. If it be true that he did not represent Fretz, still he had no right to do an act of gain to himself, but of no benefit to Fretz. Besides, what ground had he for supposing that Fretz gave authority to Chilton to make such a sacrifice? As a sensible man lie must have known that this could not be so, especially as the debt was secured by a deed of trust on a valuable farm. It is impossible to escape the conviction that there was collusion between Chilton and Stover in the transaction, but whether this be so or not, the transaction itself was invalid.
 

 In recognition that this might be the judgment of the court, Stover asks that his payments may be applied towards the debt for professional services due Chilton from the appellants. Without stopping to inquire whether this could be done, if the appellants owed Chilton anything, it is enough to say that the evidence shows that the indebtedness is the other way.
 

 It is claimed that the Virginia bank notes at least should be treated as payment pro tanto, but, as we are advised, the difference between their market value and that of Confederate bonds and notes wás merely nominal during the war, and when it ended the bank notes were worthless, being only secured by Confederate bonds.
 
 *
 
 Apart from this, the
 
 *208
 
 evidence shows they were, when paid, equally with Confederate paper valueless in Pennsylvania.
 

 The views taken of this case accord with
 
 Ward
 
 v.
 
 Smith
 

 *
 

 and are supported by the Court of Appeals of Virginia in
 
 Alley et al.
 
 v.
 
 Rogers.
 

 †
 

 It follows, from what has been said, that the bond given by Charles Stover to Isaac Fretz and Catharine his wife has not been paid, or any part of it, and that the deed of trust to secure it is still a subsisting security iu full force and effect.
 

 Decree reversed and the cause remanded, with instructions to enter a decree for Catharine Fretz, survivor of her husband, in conformity with this opinion.
 

 Reversal and remand accordingly.
 

 *
 

 6 Wallace, 310.
 

 †
 

 Story’s Equity Pleadings,
 
 §
 
 377. .
 

 ‡
 

 Gunnell v. Bird, 10 Wallace, 308.
 

 *
 

 See the ordinances adopted by the Convention of Virginia in June and July, 1861, after the State had seceded.
 

 *
 

 7 Wallace, 451.
 

 †
 

 19 Grattan, 881.