## HYATT v. McBURNEY.

1. In 1857 B. purchased land from the executors of A., and gave bonds and mortgage for the purchase-money. B. sold to C. in 1862 for confederate money, and applied it to the payment of his bonds and mortgage, which were marked satisfied. C. then mortgaged this land to H. Afterwards, in suit brought in the United States Court by the heirs of A. against B. and C., and the executors of A. (H. not being a party), the payment by B. in confederate money was held by the Supreme Court to be fraudulent and void, and foreclosure was decreed of the mortgage of B. to the executors of A., the rights of H. being expressly declared to be not affected. In subsequent action by H. for foreclosure of his mortgage, *held*, that the validity of B.'s mortgage was not *res adjudicata* as to H.

2. A petition for removal of the cause to the United States Courts properly refused, the petition not having been filed in time, and the fact upon which the application was based not being made to appear from the record as a whole.

3. A finding of fact by the Circuit judge—that a payment made and received in confederate money was free from fraud—sustained.

4. A party purchasing lands from executors under a power given in the will, was discharged of his bonds and mortgage for the purchase-money by making payment of them to one of the executors, who surrendered the bonds and entered satisfaction on the mortgage, notwithstanding it appeared in the filed returns of the executors, that the bonds had been transferred to themselves, as trustees under the will, within a year of testator's death, no transfer, however, appearing upon the papers themselves.

5. It is settled in this State that payment of an *ante bellum* debt, made to an executor in confederate money, was not *ipso facto* void, and in all such cases the debtor, if not guilty of fraud and collusion, was discharged from his debt by the payment.

6. This case distinguished from *McDuffie* v. *McIntyre*, 11 *S. C.* 551.

---

Before PRESSLEY, J., Charleston, June, 1880.

This was an action by the executors and devisees of Edmund Hyatt, deceased, of the State of New York, against William

McBurney, William Hasseltine, Alfred L. Gillespie and T. R. McGahan, members of the late firm of Hyatt, McBurney & Co., and Caroline Carson. The purpose of the action and the facts generally are stated in the opinion.

The petition for removal of the cause to the Circuit Court of the United States for the District of South Carolina, was based upon the allegation that the plaintiffs were citizens of New York and Spain, and the petitioner, Mrs. Carson, a citizen of Massachusetts, and the other defendants of South Carolina, Tennessee and California. The petition was not verified, but was supported by the affidavit of her attorney, James Lowndes, duly sworn to before a notary public, of Washington, D. C., which was as follows:

Personally appeared before me, James Lowndes, and made oath that he is the attorney of Caroline Carson, and has read her petition for the removal of the said cause to the Circuit Court of the United States for the District of South Carolina, and that the facts therein stated are true, to the best of his information and belief, save that he cannot aver that Dean Hall is of greater value than $5,500; that his information as to the domicile of Hasseltine is drawn from a statement made to him by some person, whose name he cannot recall; that his information as to the domicile of Caroline Carson is drawn from these facts, viz., that about July 1st, 1877, he received in due course of mail a letter from the said Caroline Carson, dated at Brookline, Massachusetts, in which she informed the deponent that she had made a declaration or affidavit of her change of domicile from New York to Massachusetts; and that deponent continued to receive letters from her in the latter State during the month of July, 1877, and he knows her purpose to have been to become a citizen of Massachusetts; and he knows that she has not, in fact for many years, resided in New York.

Upon this petition, Judge Pressley signed the following order:

The plaintiffs in this case, except one, a Spanish subject, are citizens of the State of New York, and the controversy, as appears by the pleadings, is wholly between them and the defendant, Caroline Carson, who, in her answer, states that she is also a citizen of that State. She has also filed with her

answer an exhibit of a previous case in the United States Court relating to the same matter; in which case she was plaintiff, suing as a citizen of the State of New York. No motion has been made by her for leave to amend or withdraw her answer, nor has any affidavit or other testimony been submitted showing that her answer was erroneous and the matter therein in reference to her citizenship was inserted by inadvertence or mistake.

After this case had been referred to the master, and after the filing of her said answer by the said defendant, and the master, attended by the attorneys for plaintiffs and said defendant, had finished taking the testimony offered by the plaintiffs, the said defendant filed a petition in this court praying a removal of this case to the Circuit Court of the United States, and alleging that she is a citizen of the State of Massachusetts. That petition is not properly verified, and the insufficient affidavit by her attorney does not state any matter which would justify me in disregarding the positive statement in her answer and exhibit.

I, therefore, hold that the controversy in this case is between a citizen of the State of New York on the one side, and other citizens of the same State and a Spanish subject on the other side; and, further, that the petition of defendant for the removal of the case was not filed until after the trial had commenced. She is, therefore, not entitled to have the case removed from this court, and her motion to that effect is refused.

Upon the merits, Judge Pressley filed the following decree:

In this case plaintiffs seek to foreclose their mortgage on Dean Hall plantation, which secures a debt due them by McBurney & Co. Their co-defendant, Mrs. Carson, held an older mortgage on said plantation, which one of the executors to whom the mortgage was given, satisfied during the late war. That satisfaction was set aside as fraudulent and void by the Supreme Court of the United States, in a case to which McBurney & Co. were parties, but plaintiffs here were not parties to that case.

I find here, not a shadow of fraud, either in the circumstances attending the said satisfaction, or in the nature of the payment, and the very high character of all parties to that transaction, would rebut even strong proof of fraud, if such had been produced in the case. In the absence of all proof in that respect, I

follow the decisions of the Supreme Court of this State, and hold that plaintiffs have a valid mortgage on said plantation, discharged of the said older mortgage.

But the obligors of the bond which plaintiffs' mortgage secures, being parties to the decision of the United States Court, are bound by it. It is a final adjudication of their rights, which I am bound to respect. In doing so, I must give it full effect if that can be done without impairing the lien of the plaintiffs. They are not entitled to enforce payment of their bond out of property which the said decision gives to Mrs. Carson, if they can, without difficult or expensive litigation, enforce payment by the obligors, who are bound by the said decision. Were I to decree that, my profession of respect for that decision would be only a flimsy pretense.

It is, therefore, ordered that this case be recommitted to Master Clancy, to take testimony and report whether the plaintiffs can, without difficult or expensive litigation, procure payment from the obligors of said bond otherwise than by the foreclosure of their said mortgage.

The code, as construed by the Supreme Court of this State, requires that every case, without regard to the pleadings, be decided according to right. To that end leave must be granted to amend the pleadings, even after the hearing. If Mrs. Carson be advised that amendment of her answer be necessary, leave to amend it according to the claim set up by her at the hearing, is hereby granted.

An appeal taken by plaintiffs from this decree has been heretofore heard by this court, and will be found reported in 15 *S. C.* 393.

To this decree the defendant, Mrs. Carson, also excepted, but did not at that time prosecute her appeal. Her exception was as follows:

The defendant, Caroline Carson, excepts, for the purpose of an appeal to the Supreme Court, to so much of the decree of his Honor Judge Pressley as decides that the plaintiffs have a valid mortgage on the property mentioned in the pleadings, or any lien thereon, superior to the mortgage of Ball to the executors of Carson; which, in the case in the Supreme Court of the

United States, to which McBurney, the mortgagor, was a party, was adjudged a subsisting mortgage when McBurney became purchaser of the property, and prior to the date of the mortgage to the plaintiff's testator.

Upon the return of the cause to the Circuit Court, Judge Kershaw passed an order for foreclosure and sale, and defendant, Mrs. Carson, excepted and appealed upon the grounds stated in the opinion. A motion by plaintiffs to dismiss this appeal was refused. 17 *S. C.* 145.

*Messrs. A. G. Magrath, H. E. Young,* for appellant.

*Messrs. McCrady & Sons,* contra.

October 28th, 1882. The opinion of the court was delivered by

MR. CHIEF JUSTICE SIMPSON. The facts of this case, not controverted, are as follows: Edmund Hyatt, late a citizen of the State of New York, together with William McBurney, William Hasseltine, Alfred S. Gillespie and Thomas R. McGahan, in December, 1862, and for some time prior, were copartners, doing business under the name and style of Hyatt, McBurney & Co., in the city of Charleston. In December, 1862, this firm purchased from one Elias N. Ball a certain plantation, located in Charleston county, known as Dean Hall, for $100,000, which was paid in confederate treasury notes. This land had been purchased by Ball in 1857 from the executors of William A. Carson, deceased, partly for cash and partly on a credit, the credit portion being secured by a mortgage of the premises executed to said executors, and it was the understanding between McBurney & Co. and Ball, that he would extinguish this debt, and have the mortgage delivered up and canceled. This was done by Ball, with so much of the confederate money received by him from McBurney as was necessary. This transaction took place between Ball and one of the executors, Robertson, the other of the two who had qualified having, before that time, left the State.

In May, 1863, the copartnership of Hyatt, McBurney & Co., being about to expire, Hyatt sold his interest in the concern and

in the "Dean Hall" place to the other members of the firm, in consideration of $40,000, and withdrew, this sum being secured to the said Hyatt by the bond of the new firm, with a mortgage of the "Dean Hall place."

This place had formerly belonged to William A. Carson. Carson died in 1856, testate, leaving a widow, Mrs. Caroline Carson, and two minor sons, William and James Petigru Carson. In his will he appointed Alexander Robertson and John Freer Blacklock his executors, and, after making certain specific bequests, he directed his executors to sell the residue of his estate, the proceeds to be applied; first, to the payment of his debts, and then the balance to be divided into three equal parts, one-third to be held by them in trust for his wife, Caroline, during her life, and the other two-thirds for his sons, William and James Petigru, to be paid to them, absolutely, on their attaining their majority. Under this power of sale, with which the executors were invested, Alexander Robertson and John Freer Blacklock, after qualifying, proceeded to sell the estate, selling the "Dean Hall place" to Elias N. Ball for $50,000, the larger portion being on a credit, which was secured by mortgage of the premises, executed on March 2d, 1857.

After the late war between the States had ended, to wit, on August 11th, 1866, Mrs. Carson, who had become the owner of her sons' interests under the will of their father, and who was living in the State of New York, instituted in her own name proceedings in the Circuit Court of the United States for the District of South Carolina, to have the bonds of Ball surrendered by Robertson, the executor, declared valid and subsisting securities and the mortgage given to secure them a valid and subsisting lien on "Dean Hall" (notwithstanding it had been canceled), and praying a foreclosure thereof.

To this proceeding, all of the members of the late firm of Hyatt, McBurney & Co., were made parties, except Hyatt, who could not be impleaded, because he was a citizen of New York, of which State the plaintiff was also a citizen. The case was, however, heard as to the other parties, the Circuit Court sustaining the complaint of the plaintiff, and ordering the foreclosure, which decree, upon appeal, was ultimately affirmed by the

Supreme Court of the United States, at its October term, 1878. 99 *U. S.* 571. The judgment of the court was based in part on the ground of fraud, in the transaction between McBurney & Co., Ball and Robertson expressed in the following strong terms, as found in the opinion : "There was evidently a plot ; McBurney & Co. were its contrivers, Ball was its instrument, Robertson was their dupe, and the Carsons the victims." Under this decree, "Dean Hall" was sold by the marshal for the District of South Carolina, on November 26th, 1879, Mrs. Carson being the purchaser.

In the meantime, to wit, on October 15th, 1879, the plaintiff, as executrix, executor, and heirs-at-law of Hyatt, then deceased, instituted the action below, for the foreclosure of the mortgage from McBurney and Gillespie to the said Hyatt, above referred to. To this action Mrs. Carson was made a party defendant, who, failing to answer within the required time, the case as to her was placed on Calendar 6, for judgment. She, however, afterwards appeared, and was granted on December 16th, 1879, further time to answer, she consenting to an order of reference. The answer was filed on January 31st, 1880, thereafter.

In this answer, Mrs. Carson, after stating the death of her husband, the fact that he left a will, the sale by his executors of the Dean Hall place to Ball, and several other unimportant facts, avers, that on and before June 4th, 1857, all the debts of the estate having been paid, the executors made distribution of the assets, and transferred to themselves, as trustees under the will, the Ball bonds and mortgage, to wit, to themselves, as trustees of herself, one bond of $9,000, and one-third interest in one bond of $4,000, and to themselves, as trustees of her two sons, the same amount for each in bonds, making, in the aggregate, $31,000 in bonds, and that they then took and held, as said trustees, the mortgage of Dean Hall, securing the said debt of $31,000. That the said mortgage was not satisfied until July 21st, A. D. 1866, when, she alleged that, Robertson alone, and at the instance of McBurney, executed a satisfaction on it. That at the time of the surrender of the Ball bonds by Robertson, they could have been exchanged in the market for more than double the amount in confederate treasury notes of their

face value; and, finally, she interposed the decree of the Supreme Court of the United States, and claimed that the plaintiffs were estopped by that decree from denying the validity of the said bonds and mortgage, held by Robertson, as trustee as aforesaid, or their priority to that of plaintiffs, and that this plaintiff could not enforce their mortgage without first redeeming the Ball mortgage.

The case, as has been stated, was referred to the master, who proceeded to hold the reference, when, after one or two sittings, Mrs. Carson, through her attorney, gave notice to the master, that he had that day filed a petition in the clerk's office, praying, among other things, the removal of the cause into the United States Court, and that he would not continue the reference before him. Whereupon the attorney of the plaintiffs moved that the master file his report of the testimony taken.

Under this state of things the case came on for hearing before Judge Pressley, who dismissed the petition for removal, holding that the defendant, under the circumstances, was not entitled to the motion, it appearing in the answer by her own statement that she was a citizen of the same State as the plaintiffs, the State of New York, and no affidavit being submitted that this statement was erroneous or inserted by mistake; and, further, that the petition came too late, it having been presented after the filing of her answer in the cause, and after the master, attended by the attorneys on both sides, had finished taking the testimony offered by the plaintiffs; and, moreover, that the petition was not properly verified, the affidavit of the attorney not being sufficient to justify him in disregarding the positive statement in the answer of Mrs. Carson as to her citizenship.

Judge Pressley then proceeded to hear the case on its merits, finally pronouncing a decree, in which he stated, "that he found not a shadow of fraud, either in the circumstances attending the satisfaction or in the nature of the payment, * * * and that, in the absence of all proof in that respect, he would follow the decisions of the Supreme Court of this State, and hold that plaintiff had a valid mortgage on said plantation, discharged of said older mortgage." Upon the findings in this decree, a judgment of foreclosure in favor of the plaintiffs was ultimately pro-

nounced by the Circuit Court. And now from this judgment this appeal has come.

The appeal is urged upon four grounds: First, that the judgment of the Supreme Court of the United States, in *McBurney* v. *Carson*, 99 *U. S.* 571, is conclusive of the case, on the principle of *res adjudicata*; second, that the court below should have let go its jurisdiction upon the filing of the petition for removal by the defendant, and upon the facts therein stated; third, "that Judge Pressley erred in holding that he found not a shadow of fraud either in the circumstances attending the satisfaction of the mortgage or in the nature of the payments," and, fourth, that he erred "in holding that the plaintiffs had a valid mortgage on said plantation, discharged of the said older mortgage." These grounds we will consider in the order in which they are stated.

We have been somewhat surprised at the earnestness with which the appellant has pressed upon the court the first ground of appeal, in the face of the language of the decree which she invokes. How could the Supreme Court of the United States have expressed more distinctly its own opinion, that the rights of Hyatt were not being adjudicated in the cases of *Carson* v. *Robertson* and *McBurney* v. *Carson*, than in the following language found in the opinion: "If he (Hyatt) shall not be made a party and the complainant shall be successful, his rights will not be affected by the decree. In such case he can file a new and independent bill, and renew the litigation as to all the questions touching the prior mortgage which are involved in this controversy. The complainant has the option to make him a party, or to proceed without him, and take the hazard of the consequences." *Robertson* v. *Carson*, 19 *Wall.* 106. Could language be stronger, or more direct to the point?

Again, the court said: "This court has held that Hyatt was not an indispensable party, as the decree would not affect his rights." *McBurney* v. *Carson*, 99 *U. S.* 569. Mr. Justice Swayne, who delivered the opinion of the court in both of these cases, in support of the principles announced, refers to *Haines* v. *Beach*, 3 *Johns. Ch.* 459, where Chancellor Kent, speaks as follows: "The necessity of making the subsequent encum-

brancers parties, or holding their rights unimpaired, appears to be much stronger, and is indispensable to justice in cases of decrees for sale according to our practice, for otherwise the mortgagor would take the surplus money, or the cash value of the equity of redemption, and defeat entirely the lien of the subsequent creditor. But their rights cannot be destroyed in this way, and the purchaser will take only a title against the parties to the suit, and he cannot set it up against the subsisting equity of those encumbrancers who are not parties." The court seems to have anticipated that the question of *res adjudicata* might arise in future as to Hyatt, and to prevent its interposition, and to free it from all doubt, these strong expressions appear to have been used. See also *Horn* v. *Lockhart,* 17 *Wall.* 570.

It will not do to say that these expressions were *obiter,* because the very question in the case of *Robertson* v. *Carson* was, whether Hyatt was an indispensable party, which necessarily involved the further question as to the effect of the judgment of the court upon Hyatt's rights and interests. Instead, therefore, of the case of *McBurney* v. *Carson* being *res adjudicata* against Hyatt, and concluding him, it is rather *res adjudicata* for him—rather a judicial determination that he has not been concluded—and that all the questions, both of law and fact, involved in that case, though decided against the parties before the court, were especially left open for him.

But, independent of this, the authorities relied on by the appellant, failed to sustain her position. It is true, no one can doubt the propositions announced in appellants' argument, to wit, that "such effect as would belong to a judgment of the courts of this State, should be given to the judgments of the courts of the United States, rendered under similar circumstances." *Dupasseur* v. *Rochereau,* 21 *Wall.* 135. "That judgments of the courts of the United States, when relied on in the State courts, have the same effect as judgments of the other States." *Story Confl. L., Sec.* 609. That "Circuit and District Courts of the United States, certainly cannot be considered as foreign in any sense of the term, either in respect to the State courts in which they are, or as respects the Circuit or District Courts of another circuit or district. On the contrary, they are

domestic tribunals, whose proceedings all other courts of the country are bound to respect." 95 *U. S.* 423. " That full faith and credit shall be given in each State to the public acts, records and judicial proceedings of every other State." *Art. IV., Sec.* 1 *Const. of U. S.*

These are all sound as general rules, and this court will never wantonly or heedlessly violate the spirit which they breathe. It fully recognizes the fact that the judiciary organized under the general government, as well as that of all the States, is engaged in the same great work for the advancement of the interests and the welfare of a common country, and not only will full faith and credit be given here to the proceedings of the courts elsewhere, but all due respect will be paid to their judgments.

In reaching our conclusions, we are willing to be aided from any quarter, and especially do we rely upon the opinions pronounced by learned and distinguished judges elsewhere. But do these principles warrant the conclusion, which the appellant seeks to draw from them, as applicable to the questions involved in her appeal? We think there is a wide gap between them as premises, and the conclusion which the appellant desires this court to enforce. She invokes, in substance, the plea of *res adjudicata.* The question for this court then to determine is not whether we shall pay proper respect to the judgment of the Supreme Court of the United States, but whether, according to the principles which govern the plea of *res adjudicata,* it is applicable to this case.

What are those principles? They have been recently laid down by this court, as we understand them, in the case of *Mauldin* v. *Gossett,* 15 *S. C.* 565. We held, in that case, for this plea to be effective, the concurrence of four conditions was required, first, identity of the thing sued for or in controversy; second, identity of the cause of action; third, identity in the persons or parties, and, fourth, identity in the quality of the persons for or against whom the claim is made. And this court said: " If any one of these unities is wanting, and especially the unity of parties, the plea cannot be made out, because, while

O

it is just and proper that litigation between the same parties, after they have once had their rights adjudicated by a competent tribunal without appeal, should end, yet, a thing done between others ought not to injure another.    A transaction between two parties ought not to operate to the disadvantage of a third.    The maxim, *res inter alios acta nocere non debet*, is as strong for the protection of those not before the Court, as that of *res adjudicata* for those who are present."

These four unities are all necessary to the plea of *res adjudicata;* but of the four, that of parties is perhaps the most important.    In fact, it is absolutely essential, because the court has no jurisdiction over one not before it.    Here, it was a recognized fact that Hyatt was not before the court.    The necessity of his presence was one of the questions in the case, the court holding, as has already been stated, that this was not indispensable as to the rights of those who were present, but expressly declaring that Hyatt could not and should not be prejudiced.    In several of the cases cited by appellant, the parties were the same in both courts.    Such was the fact in *Christmas* v. *Russell*, 5 *Wall.* 290 ; *Mills* v. *Duryea*, 7 *Or.* 483 ; and *McElmoyle* v. *Cohen*, 13 *Pet.* 324.    And the question was, what effect should be given to the proceedings of the first court in such cases.    The principles announced in these cases are not controverted, but they have no application here.

In *Dupasseur* v. *Rochereau*, 21 *Wall.* 135, the facts were somewhat similar to the facts here.    " Judgment had been rendered by the Circuit Court of the United States for a party, declaring that his mortgage was the first lien on the land, and the marshal sold the property clear of all prior liens, the mortgagee being the purchaser.    This judgment and sale was set up by way of defense to a suit brought in the State court by another mortgagee, who claimed priority to the first mortgage, and who had not been made a party to the suit.    The State court held that the plaintiff was not bound by the former judgment on the question of priority, not being a party to the suit.    The case was brought to the Supreme Court of the United States by writ of error, and that court held that the State court did not refuse to accord due force and effect to the judgment; that such a judg-

ment in the State courts would not be conclusive on the point in question, and the judgment of the Circuit Court could not have any greater force and effect than judgments in the State courts." Extract from syllabus of *Dupasseur* v. *Rochereau*, 21 *Wall.* 130.

In *Green* v. *Van Buskirk*, 5 *Wall.* 307, Van Buskirk was held bound by a proceeding to which he was not a party, and this, at first view, would seem in conflict with the position taken above, but upon an examination of the case, this, we think, will be found to be a mistake. Bates owned certain safes at Chicago. These he mortgaged to Van Buskirk, in the State of New York, but the mortgage was not duly recorded in Illinois, and possession was not delivered to Van Buskirk. Green attached the safes in Chicago, after the date of the mortgage to Van Buskirk, and sold them and received the proceeds. Van Buskirk sued Green, in New York, for these proceeds. Green pleaded the proceedings in Illinois. The court in New York disregarded the Illinois judgment, and decreed for Van Buskirk. The Supreme Court of the United States held that this was error, and that the judgment in Illinois was binding upon Van Buskirk, although he was not a party to that proceeding. This decision, however, was based upon the fact that in the proceedings in Illinois, the court there had given construction to the law of Illinois as to recording mortgages and the necessity of delivery of property to pass the title, which construction, upon a familiar principle, was binding upon other courts, and, therefore, should not have been disregarded by the court in New York. But the court also held, that, notwithstanding the proceeding in Illinois adjudicating the safes to Green, Van Buskirk would still have the right to set up title to the property if he had such as was superior to that conferred by the attachment proceedings in Illinois, and, further, that he had the right to show that the property was not liable to attachment, from all of which he would have been barred had he been a party to that suit. In other words, he was bound by the construction of the Illinois statute by the Illinois court, but not by the facts of a case to which he was no party. This case, thus understood, fails to support the appellant.

We feel constrained to overrule the first ground of appeal, both upon principle and authority.

Second. Did Judge Pressley err in refusing the removal of this cause to the Circuit Court of the United States for the district of South Carolina? Judge Pressley, in his order refusing the motion to remove, gives the reasons for his action. They seem to us to be quite sufficient, and to be sustained by authority. It did not appear from the record of the case, to the satisfaction of Judge Pressley, that the parties were citizens of different States. Nor was the petition filed within proper time, as required by the act of congress. Chief Justice Waite, in the *Railway Co.* v. *Ramsey*, 22 *Wall.* 328, said: "To obtain a transfer of a suit, the party claiming it must file in the State court a petition therefor, and tender the requisite security. Such petition must state facts sufficient to entitle him to have the transfer made. This cannot be done without showing that the Circuit Court would have jurisdiction of the suit when transferred. The one necessarily includes the other. If, upon the hearing of the petition, it is sustained by proof, the State court can proceed no further."

The facts stated in this petition were, perhaps, sufficient to entitle the petitioner to the order, had the petition been filed within proper time and had the facts stated been sustained by the record as a whole, but the petition broke down at both of these points. It was not filed as required by the act of congress (1875) at or before the term at which the suit could have been tried, nor did it appear upon the face of the record that the citizenship of Mrs. Carson was in Massachusetts. True, this fact was stated in the petition, but her answer distinctly states that she was a citizen of New York. Thus, the record on its face fails to show the important fact required for removal. *Meyer* v. *Construction Co.*, 100 *U. S.* 457. Hence, Judge Pressley had no other alternative but to dismiss the petition upon both of the grounds mentioned.

Third. Appellant insists that Judge Pressley erred in holding as follows: "I find here not a shadow of fraud, either in the circumstances attending the said satisfaction, or in the nature of the payments." We have carefully examined the evidence

reported by the master, and upon which Judge Pressley heard the case, and we not only fail to see that his finding of fact in this respect is either without evidence, or opposed to its preponderance, one of which is necessary under our decisions to reverse it; but, on the contrary, we concur with him, that there is not a shadow of evidence in the case tainting the transaction with moral fraud and corruption, either as he stated in the satisfaction of the mortgage, or in the nature of the payments. No one knowing the parties and having the testimony before him, which Judge Pressley had, especially that the late lamented James L. Pettigru, the father of Mrs. Carson, and grandfather of the other two beneficiaries, under W. A. Carson's will, not only had full knowledge of the whole transaction, but desired and approved its consummation, could, for a moment, believe, that it was conceived and perpetrated in fraud.

It is true that the settlement was based on confederate treasury notes, which soon thereafter turned to ashes; but at that time, there was no other medium of exchange in this Southern country. The fortunes of war had driven every other from our midst. It had become, from necessity, the currency of the courts, judicial sales, banks and bankers, professional men, merchants, and all classes of business. It was received for labor and all kind of service, and property of every species, real and personal, constantly changed hands upon it. It paid notes, bonds and judgments, and was for years the very life-blood of the people in all their business relations. If simply the use of this money by them is enough to fix fraud upon McBurney, Ball and Robertson, in a legitimate transaction, thus completed in open day-light, and in the very presence of the nearest relative of the parties, who at that time was the acknowledged head, not only of the bar of South Carolina, but of the entire south, and with few equals anywhere, and equally as distinguished for his high personal integrity and abhorrence of fraud, then the people of the Southern States, as a whole, were steeped in fraud during the war, because everybody, without exception, used it then. We see no error in this finding of the Circuit judge, upon the evidence before him.

Fourth. Did the Circuit judge err in holding that the plaint-

iff had a valid mortgage on Dean Hall, discharged of the Ball mortgage? This part of Judge Pressley's decree is assailed upon three grounds, first, that the Ball bonds and mortgage had been transferred by the executors from themselves, as such to themselves as trustees, under Carson's will in 1857, and, therefore, Robertson, one of the executors, had no legal right to receive payment of these bonds, or to cancel the mortgage in 1862; second, that Robertson, as one of the executors, had no right to act alone, even if the bonds and mortgage were still in their possession as legal owners, because, being in that event joint owners, neither could act alone; third, that in no event could the debt of Ball be legally discharged by the executors in such currency, without the consent of the *cestuis que trust.* In other words, the appellant contends that the executors were trustees, and that, therefore, they could not, even as executors, receive payment of the Ball debt in anything but legal currency.

To entitle the first ground to consideration, the fact upon which it is based should appear as an established fact in the case, to wit, that the bonds and mortgage of Ball had actually been assigned by the executors to themselves, as trustees, before the payment by Ball. This was a question of fact involving at the same time the question of law, whether at the time of the alleged transfer it was legally competent for the executors to make such a transfer. The will directed that the proceeds of the sale of the property should first be applied to the payment of the testator's debts, and then the residue to be divided and held in trust by his executors for his wife and children. Under our law, executors and administrators are allowed one year to ascertain the indebtedness of the estate, and the courts will not take judicial cognizance of proceedings instituted for the purpose of making distribution of the estate of the deceased, until after the expiration of one year from his death. So said Chancellor Dunkin, in *Adger* v. *Adger, MS. Dec., Charleston,* 1859, *p.* 252. In this case, Carson died on August 17th, 1856. It is claimed that the transfer was made June 22d, 1857. This was within the year, and was premature.

But independent of this legal question, has the fact of the assignment been legally established in such way that Judge

Pressley could not have disregarded it as a fact? Judge Pressley does not state his finding upon that question, but we think the testimony was hardly sufficient to establish this fact. The only evidence upon the subject was the returns of the executors filed in the Probate Court. There was nothing upon the original papers, which were the subject of transfer, showing the assignment. The executors had not been discharged by any official act of the Probate judge, nor any notice given that the duties of trustees had been assumed by them. The papers had been originally executed to Robertson and Blacklock, as executors, and they still appeared upon their face to belong to these parties in the same capacity.

Under this state of facts, in our opinion, the testimony was not sufficient to establish the transfer claimed, and, on that account, the ruling of Judge Pressley is not obnoxious to the first objection. But even if the transfer had been regularly made, would it defeat the payment made by Ball if that payment was free from fraud and collusion and otherwise legal? This would be a fraud upon Ball. Finding his bonds in the hands of those to whom he had executed them, with no mark of transfer and nothing whatever to excite suspicion, he was fully justified in acting upon the representation that they were still the legal owners. He knew no one in the transaction but the executors. They were his creditors. He found his bonds and mortgage in the possession of one of them, the other having left the State, and he paid off the debt and canceled the mortgage. If this payment was otherwise legal no court could disturb it. This was not a case where the debtor was bound to see to the application of the fund at his peril. The executors had full power under the will to sell the estate and receive payment, and it was no business of the purchasers to follow the funds to their directed destination. *Laurens* v. *Lucas*, 6 *Rich. Eq.* 226.

It is not necessary to discuss the second ground above. It is familiar law, that executors are not bound to act jointly in receiving payment of debts due them as such, or the estate. In most respects, the act of one is the act of all. Either can release or pay a debt. 2 *Wms. Ex.* 946 ; *Earle* v. *Anderson*, 9 *S. C.* 460 ; *Tompkins* v. *Tompkins*, *ante* 1. This is not denied by the appel-

lant.   In fact it is admitted in the argument, and it has only been referred to herein, because, in the answer, the ground is taken that Robertson alone executed the satisfaction on the mortgage.

This brings us to the consideration of the last ground urged against this last holding of the presiding judge.   Could the executors legally receive confederate currency in payment of the Ball bonds, and thereupon execute satisfaction of the mortgage ? This is independent of the question of actual fraud, and raises the point whether it is competent for executors, or any other trustees having charge of the estates of others, to settle with the debtors of such estates, upon any other basis than legal currency. Not whether such settlement is a breach of trust on the part of the trustees, but whether the debtor can be discharged, except upon the payment of legal currency.

Many vexed and anomalous questions have grown out of the use of confederate currency during the war by the people of the Southern States, and numerous decisions are found in our own reports upon this subject, both before the adoption of the constitution of 1868, and since.   While among these cases, several are found where trustees have been held liable (under certain circumstances) for a breach of trust in receiving this currency, not a single case appears where the debtor to the trustee has been made to repay his debt, once paid in such currency in the absence of all fraud and collusion between the parties.   The old court, as organized before reconstruction, as well as the court as organized since, has invariably held that executors and administrators, being the legal owners of estates under their charge, have all the rights of such owners, so far as their relations to third parties are concerned ; and while they may be held responsible to their *cestuis que trust* for failing to observe proper care and legal prudence in the discharge of their fiduciary duties, either in the collection or investment of the bonds under their control, or otherwise ; yet, where the transaction is free from fraud, the *cestui que trust*, if he feels aggrieved, must look alone to the trustees for redress.   He cannot push the trustees aside, and assail his debtor.

This seems to have been well settled in this State, so far as a

series of decisions of the court of last resort can settle a principle. Out of the many cases found in the reports in which the subject of confederate currency and confederate transactions has been discussed, the following are referred to as especially bearing on the question now before the court: *McPherson* v. *Gray,* 14 *Rich. Eq.* 128; *Wiseman and Finley* v. *Hunter, Ib.* 175; *Mayer* v. *Mordecai,* 1 *S. C.* 399; *Sanders* v. *Rogers, Ib.* 452; *Creighton* v. *Pringle,* 3 *S. C.* 97; *Cureton* v. *Watson,* 3 *S. C.* 458; *Chalk* v. *Patterson,* 4 *S. C.* 98; *Singleton* v. *Lowndes,* 9 *S. C.* 465; and *State* v. *Moseley,* 10 *S. C.* 1—the two former of which were decided by the old court before the constitution of 1868, the others, since.

In most of the cases, the main question was whether the trustee had committed a breach of trust in receiving confederate money, and thereby discharging their debtors. The question being determined upon the principles applicable to the duties of the special trust, such as good faith, reasonable diligence, a proper observance of the terms of the trust, and of the law prescribing the duties of trustees; but in several the precise question under discussion was considered and adjudged; and, we think, that those of the first class, in which the trustee has been held liable, negatively sustains the discharge of the debtor, as fully as the second class does affirmatively, because the only ground upon which the trustee could be held responsible as for a breach of trust, is the fact that he has discharged the debtor. If the debtor has not been discharged, then no injury has been done, and no breach of trust committed. Thus all of these cases may be regarded as authority for Judge Pressley's holding, now under consideration.

In *McPherson* v. *Gray,* 14 *Rich. Eq.,* a decree on creditors bill, made in 1859, directed the master to sell testator's estate for one-third cash, and the residue on a credit, secured by mortgage, the debts to be paid out of the proceeds, and the residue, subject to the trust of the testator's will, to abide the future order of the court. The master made the sales, and took from the purchaser of a plantation his bond for a large sum of money, with mortgage. In January and March, 1864, the purchaser paid the bond to the master in confederate treasury notes—a

currency which at that time had greatly depreciated, but which was the only currency in the country. The court, concluding that the payment was made in good faith, held that neither the purchaser nor the master was liable to the beneficial owners of the bond, Wardlaw, A. J., delivering the opinion of the court.

There is a striking similarity between this case and the case now before the court. In both cases, land was sold before the war, partly for cash and partly on a credit, and a mortgage taken to secure the credit portion of the sale, the proceeds of the sale first to be applied to the debts, the residue to be held subject to the trusts of testator's will. In both, the purchaser paid the purchase money in depreciated currency—confederate notes— the first being paid in 1864, the latter in 1862. In both, there was an entire loss to the *cestuis que trust.* In both, the payments were made in good faith. In the first, the court, consisting of Dunkin, Wardlaw and Glover, the latter sitting in the place of Inglis, concurred in holding that neither the purchaser nor the master were liable to the beneficial owners of the bond, and why should not such be the holding in the present case? There is no difference whatever between the two cases, except that, in the present case, Robertson was an executor, deriving his authority to sell from a will; and, in *McPherson* v. *Gray*, Gray was the master in equity, deriving his authority to sell from an order of the court. The trusts to be discharged were the same, and both were trustees. Executors, we suppose, are trustees, and Mr. Justice Wardlaw said in terms that " Mr. Gray, the master, was a trustee." *McPherson* v. *Gray, p.* 130, *supra.*

In *Wiseman and Finley* v. *Hunter*, 14 *Rich. Eq.* 167, under an order made in June, 1861, to collect a certain bond, dated in January, 1860, with as little delay as possible, the commissioner, in August, 1862, received payment in confederate treasury notes. In May, 1863, the commissioner reported that he had collected the bond, and, on motion of the solicitor of the parties entitled to the fund, an order for distribution was made. Two of the parties resided in Tennessee, and did not receive their shares, and they sought to have the payments opened and to compel the obligor to pay their shares. The court held that the obligor was discharged by the payment, and that the transaction could

not be opened. This was in 1868, when Dunkin, D. L. Wardlaw and Inglis composed the court. "Debtors have rights as well as creditors," said the president of the court (Dunkin) in delivering the opinion, and, further, "where a transaction has been consummated and rights vested, the repose of society demands that it should not be opened." True, in this case the commissioner had been ordered to collect with as little delay as possible, and, at the instance of the solicitor of the parties, by a subsequent order distribution had been directed, but there was nothing said in either of these orders about confederate treasury notes.

*Mayer* v. *Mordecai*, 1 *S. C.* 383. By deed made in May, 1860, three bonds secured by mortgages of real estate were assigned to B. in trust, to invest the proceeds as soon as received in such manner as the said B. may think proper, on consultation with the *cestui que trust.* The *cestui que trust* removed shortly afterwards from South Carolina, where the trust was created, to New York, and remained there during the war with the Confederate States. In 1862 and 1863, B. collected the bonds in confederate treasury notes, then much depreciated, and invested the proceeds in bonds of the Confederate States, without consultation with the *cestui que trust.* *Held,* that B. committed a breach of trust in receiving payment of the bonds in confederate treasury notes and in investing the proceeds in bonds of the Confederate States, and that he was liable to account to the *cestui que trust* for the sums received. *Held, further,* that the obligors on the bonds were not liable to account to the *cestui que trust,* for they were discharged by their payments to B.

Here, unlike the cases above, the trustee was held liable, on the ground that he had acted without consolutation with the *cestui que trust,* which the deed expressly required, but the obligors, as in the other cases, were protected. This case was heard in 1869, when Moses, Williard and Hoge composed the court. Chief Justice Moses delivered the opinion, saying: "That although the trustee is not discharged from liability to account for the three bonds, yet the mortgage as against the original debtors cannot be set up as of force. The legal title to the bonds was in him, and with the investment of the proceeds

they had no concern." And again: "If, according to the ruling in this State, a vendee is not bound to see to the application of the purchase money (*Laurens* v. *Lucas*, 1 *Rich. Eq.* 226 ; *Lining* v. *Payton*, 2 *DeS.* 375), or a mortgagee, under the order of the court, that the money is appropriated to the purpose for which the mortgage was taken (*Spencer* v. *Bank of State, Bail. Eq.* 468), much less can a debtor who makes satisfaction to the creditor in a manner acceptable and agreed to by him, in the form of actual payment, be held to such requisition "—quoting what Mr. Justice Inglis said in the case of *Austin* v. *Kinsman,* 13 *Rich. Eq.* 265, to wit: "That a creditor, though entitled to demand payment in lawful money, may waive his right and accept any substitute he pleases, and by voluntary acceptance of such substitute as payment, makes it so." *Mayer* v. *Mordecai, p.* 398, *supra.*

In *Sanders* v. *Rogers*, 1 *S. C.* 452, the trustee was held liable for collecting, in 1863, well secured bonds, and failing to invest as the instrument creating the trusts directed, but there was no intimation that the payment by the obligor was invalid, or that the bonds had not been extinguished thereby. The case of *Creighton* v. *Pringle*, 3 *S. C.* 77, is to the same effect. In *Chalk* v. *Patterson*, 4 *S. C.* 98, it was held that the commissioner in equity was not liable, and, in *State* v. *Moseley*, 10 *S. C.* 6, that the sheriff was exempt from responsibility in receiving confederate money in satisfaction of an execution in his office.

These cases (and many others might be cited) establish the principle that executors and administrators and *quasi*-trustees, such as commissioners, masters and sheriffs, had authority during the war to receive the only currency which was then in existence, in satisfaction of bonds, notes and mortgages under their control, where the payment was made by the debtors free from fraud and collusion. Clearly, that the payment was not *ipso facto* void on the ground that the trustee could receive payment only in legal currency. This principle discharges the debtor in all such cases. But whether the trustee shall be exempt from responsibility is another question, which will depend in each case on its own special facts, such as good faith, reasonable and

proper diligence and care, and the terms of the trust under which he acts.

In view of these authorities coming from the court of last resort in this State, it is needless to inquire elsewhere. In any event, these must control us, running, as they do, in the same direction in an unbroken current, on the exact point involved here, from the close of the war, when these perplexing questions first arose, up to the present time. The case of *McDuffie* v. *McIntyre*, 11 *S. C.* 551, is not in conflict. That case decided that a guardian had no power to sell a bond and mortgage belonging to the estate of the ward. That such property occupied the same position that any other property of the ward would, such as a horse, a watch, goods and chattels of any kind, or real estate. Of such property belonging to the estate of his ward, the guardian has no such legal title as would authorize him to dispose of it, without the order of the court. But there is a clear distinction between such a case and that of an executor or administrator who is authorized to sell the property of the estate and take notes therefor to themselves.

The cases from the Supreme Court of the United States, relied on by appellant, had other features, different from the above cases, which prevent conflict. In *Fretz* v. *Stover*, 22 *Wall.* 198, the bonds in no sense belonged to the party who collected them. He was simply an attorney in possession for collection, and the case turned upon the question, whether he had exceeded his powers in the manner of the collection. Not being the legal owner, he had no right to exceed his agency, and the court held the parties, who paid him ·in other currency than such as his agency authorized him to receive, responsible over to the principal who repudiated the unauthorized settlement. That principle does not touch the one here. Here, the executor was the legal owner, had full power at his peril to deal with the bonds in question as he chose, to exchange, release, or compromise, which being done without fraud and free from imposition, surprise, or undue advantage, would be final, and could not be opened to the prejudice of the debtor.

In *Horn* v. *Lockhart*, 17 *Wall.* 571, an executor in the State of Alabama was held responsible for funds of the estate invested

by him in bonds of the confederate government. This was upon the ground, that inasmuch as these bonds were issued for the avowed purpose of raising funds to prosecute the war, the investment was an act giving aid and comfort to the enemies of the United States, and, therefore, void. The question of the liability of the debtors to the estate, who had paid off their indebtedness, was not involved, and not passed upon.

We see nothing in *Williams* v. *Buffy*, 96 *U. S.* 177, or in *Ketchum* v. *Buckley*, 99 *U. S.* 188, which touches the question raised here. It is said in *Williams* v. *Buffy*, by Mr. Justice Field, that "debts can only be satisfied when paid to creditors to whom they are due, or to others by direction of lawful authority." This is not controverted, on the contrary is recognized as familiar law, but it is equally good and familiar law that when creditors to whom a debt is due extinguish the debt by the receipt of that which they have consented to receive as payment—whether it be money or any other commodity—there is no authority in the courts, or any other power, to revitalize it. It becomes an executed contract and passes out of existence. We think that Robertson occupied the position of a creditor. Ball was his debtor, and Ball having paid to Robertson the amount due him in such currency as Robertson was willing to receive, the payment being *bona fide* and free from fraud and collusion, the matter then reached a finality beyond resuscitation by this court or any other legal authority.

It is the judgment of this court that the judgment of the Circuit Court be affirmed.