CHERAW & SALISBURY RAILROAD COMPANY v. COMMISSIONERS OF ANSON.

*Railroads—Corporations—Taxation.*

1. Variations in a route over which a railroad may run, do not affect the identity of a corporate body that builds it, where subsequent acts are amendatory of the original charter and give permission for a deflection from the line first projected; and the right to exemption of property from tax granted in the original charter, is retained unimpaired.

2. Where a new corporation is formed out of two existing corporations, these latter ceasing thereafter to exist, the law forming the new corporation governs and controls its corporate functions and rights.

(*R. R. Co.* v. *Reid*, 13 Wall., 264; *R. R. Co.* v. *Com'rs*, 87 N. C., 129, cited and approved).

MOTION for injunction heard at Spring Term, 1882, of ANSON Superior Court, before *Shipp, J.*

Motion refused and plaintiff appealed.

*Mr. James A. Lockhart,* for plaintiff.
*Messrs. Burwell & Walker* and *Little & Parsons,* for defendants.

SMITH, C. J.   On the 2d day of February, 1857, the general assembly passed an act incorporating a company by the name of "The Coal Fields and South Carolina Railroad Company," as designated in one section, and in another, "The Cheraw and Coal Fields Railroad," having for its object the construction of a line of railroad connecting with some one of those then built, or in course of building, in that state, and passing by Carthage, terminating at the coal fields, on Deep river, in Chatham county.   Its capital stock was fixed at two million dollars, and the company, when formed and organized, was invested with all the powers necessary to the successful prosecution of the enterprise.

Section 20 enacts "that the franchise hereby granted shall vest

in, belong to, and be enjoyed by said company and their successors for the period of ninety-nine years, and the profits thereof shall be divided among the stockholders in proportion to the stock by them respectively held, during which time the stock of said company and the real estate of said company, which may be purchased by them, and connected with, and subservient to their works hereby authorized, shall be exempt from taxation; provided that nothing herein contained shall be so construed as to deprive the general assembly for this state of the right of imposing taxes of dividends and profits, according to the stock of said company, whenever, in their discretion, it may be necessary or expedient; provided, further, that the tax which may be levied on the same shall not be greater than that levied on similar property of this state."

Section 30 provides for the annual payment to the state treasurer, after the road shall be put in operation, of a *bonus* (as it is called) of twenty cents per ton for the freight transported, and the same sum for each passenger carried over the road, with a proviso "that nothing herein contained shall be so construed as to prevent any future legislature from imposing an additional tax on freight and passengers; provided, further, that no tax shall be imposed upon said railroad, other than that imposed by this charter, greater than that imposed upon the other railroads in North Carolina, which shall reduce the net profits of said railroad below six per cent. per annum."

Concurring legislation was adopted in South Carolina, for the construction of so much of the proposed road as lay within the limits of that state, in December of the same year.

On September 13th, 1861, was passed an act professing in its title "to revive and continue in force an act entitled 'An act to incorporate the Cheraw and Coal Fields Railroad Company,'" referring by description and date to the original charter, and making some modifications in its terms. These modifications are, in substance, a reduction of the capital stock from two millions to two hundred thousand dollars; a change in the route so far as

to require that it pass within ten miles of instead of by Carthage; an authority given the directors to call for installments of ten instead of one per centum on the subscriptions; forbidding any discrimination against the railroads of this state on freight or passengers, and requiring charges for freight to be the same, agreeably to distances each way; fixing the gauge of the road at 4 feet $8\frac{1}{2}$ inches, so as to correspond with the gauge of the North Carolina railroad, compelling the road to cross the track of the Wilmington, Charlotte and Rutherford railroad at a point not west of the town of Rockingham; declaring its name to be the Cheraw and Coal Fields railroad company; and repeating sections 28 and 30 of the act amended.

On December 21st, of the same year, was passed another amendatory act, with the declared purpose in its title to amend the act of incorporation, referring to it by name and date of ratification, the first section of which substitutes two other commissioners in place of two who are superseded, and the second provides: That the company chartered by said act, when organized, and the president and directors thereof shall, in addition to the powers, rights and privileges granted by said act, have all the powers, rights and privileges, and be subject to the same liabilities, except as otherwise provided for, as are conferred and imposed by the amendments to the charter of the Cheraw and Coal Fields railroad company by an act entitled, &c., referring to that which revives and continues in force the incorporating act.

On May 10th, 1862, an ordinance passed by the state convention, then sitting, repeals the section of the charter (9) which confers the power and directs the mode of proceedings to have condemned lands necessary for the use of the road, when they cannot be purchased of the owner for want of agreement as to the price—adding a proviso, that the road may cross the Wilmington, Charlotte and Rutherford railroad within twelve miles west of Rockingham; that as much money may be spent and as much work done in the building of the road north as

south of that intersected track; and requiring the road to be completed to the Coal Fields within five years after the close of the pending civil war.

On February 1st, 1867, the company designated by its proper corporate name was authorized to receive, in payment of subscriptions to its stock, lands, bonds, stocks or other securities on terms and at rates to be agreed on between the parties.

At a later period in the same month, power was given by the general assembly to the counties along the proposed route of the road, or in its vicinity, to subscribe for shares of stock not exceeding two thousand shares to each, when approved by a popular vote, with provisions for holding an election for that purpose, and prescribing how the bonds in payment of subscriptions shall be issued and secured by the levy of taxes, to meet the payment of principal and interest.

Again, on December 16th, 1868, was ratified "An act to amend the charter of the Cheraw and Coal Fields railroad company," repealing the proviso in the ordinance, and giving five more years to the company to finish the road to the crossing already referred to, and five more years to make the extension which it authorizes.

This act authorizes, and amends the charter of the company for that end, the continued construction of the road from a point on the South Carolina line, to be selected by the company, "to a point on the line of the Wilmington, Charlotte and Rutherford railroad, at or near Wadesboro, with the privilege of extending the same across the track of the said Wilmington, Charlotte and Rutherford railroad to such point on the North Carolina railroad, at or near Salisbury, as may be selected by the said company;" changes the name of the company to that of the "Cheraw and Salisbury railroad company, and forbids a discrimination in tariffs in favor of either North or South Carolina railroads crossing or connecting with this road..

Under such friendly and fostering legislation, means have been contributed and expended in the building of the road as

far as Wadesboro, between which and the starting terminal point, trains have been and are still running, but the company's resources have been insufficient to extend the construction further.

It is manifest, and indeed not contested in the argument for the defendant (the sheriff of Anson), that the taxes which he is proceeding to collect, and to restrain him from doing which the interlocutory order of injunction asked for was denied, are repugnant to the terms of the contract of exemption contained in section 30 of the charter, and that the company is entitled to relief, if the protection and privilege therein secured are available to it in its present organization.

But the defendant contends that the changes produced by subsequent legislation are so fundamental as to have destroyed the identity of the corporation, as first formed, and substituted a new corporate organization in its place, to which the exemption has not been transferred.

In order to a satisfactory solution of the question, thus presented, we have examined the series of acts of the general assembly relating to the company, and recited the substantial provisions contained in each, and, in our opinion, the defence finds no support in any of them.

The fallacy of the argument for the alleged organic change consists, as was properly urged in the argument for the plaintiff, in the failure to distinguish between the railroad, the constructed work of the company, and the company itself. Variations in the route over which the road may run do not affect the identity of the corporate body that builds it.

Every one of the successive acts, after the grant of the charter, professes in its title to be amendatory only, and in its provisions is in fact amendatory of the original. The modifications, in some particulars, are but recognitions of the undisturbed stability of the others. None of them touch the vital parts, or impair the integrity of the organic body, as it existed at its first formation. It is the same company executing its undertaken

purpose to push forward its track into the interior portion of the state, deflecting from the line first projected only with the permission of the power that gave it being and conferred its rights, and stopping short of its distant terminus for want of means to continue the work.

The state, in the charter, agreed with the present plaintiff— (the same company, notwithstanding the change in name—and the agreement has not been since modified)—that the company might go on and build the road, and for ninety-nine years (the measure of its corporate life) the "stock" and "the real estate" which may be purchased, connected with and subservient to its works herein authorized, "shall be exempted from taxation." A section relating to the exercise of the taxing power on freight and passengers has been re-called with the assent of the stockholders, but the clause conferring the exemption has never been interfered with, and during the progress of the entire work has subsisted in full force, assuring those who should put their money and property in the enterprise, that the stock and real estate procured by it should not be subject to any tax.

The language comprehends, and is as appropriate to the stock and land, enlarged and acquired, in constructing the authorized deviating and extended track, as that contemplated in the original charter. The clause of exemption can no more be stricken out without impairing the obligation of the contract, than any and all others of its unaltered provisions, unless with the consent of the stockholders.

There are abundant precedents, if any are now needed, to sustain this view. The name and termini of the railroad, authorized in the charter granted to the Wilmington and Raleigh railroad company, were subsequently changed and a part of the line lopped off, and yet when the exemption contained in the charter was claimed and allowed, it was not suggested that the amendments had abridged the rights of the company in this regard. *Wilmington and Weldon Railroad Company* v. *Reid,* 13 Wall., 264.

The very point has been determined at the last term, in a case much stronger in the alterations of the charter, and, indeed, where a new company was formed, and yet was held to possess unimpaired the same right to a limited exemption of its property from public taxes. *Railroad Co.* v. *Com'rs of Mecklenburg*, 87 N. C., 129.

The adjudicated cases cited by defendant's counsel from the reports of the supreme court of the United States are not at variance with the views expressed. In *Tomlin* v. *Branch*, 15 Wall., 460, it is held that when one railroad company, entitled to exemptions, is merged in another with all its property, rights and privileges, the exemptions accompany and adhere to the property of the merged company, but are not extended to the property of the absorbing company, and that consolidation of two independent companies will be presumed not to have been intended to disturb the separate rights and immunities before possessed by each. *Delaware Railroad Tax*, 22 Wall., 206. Yet when a new corporation is formed out of two existing corporations—these latter ceasing thereafter to exist—the law forming the new corporation governs and controls in determining its corporate functions and rights. *Shields* v. *Ohio*, 95 U. S., 319; *Railroad* v. *Maine*, 96 U. S., 499.

The subject is discussed and the authorities commented on in Morawetz Corp., § 543, and the conclusion is that the effect is to be ascertained by examining the provisions of the statute authorizing the merger or consolidation. In our case there is neither.

The plaintiff is entitled to the restraining order and there was error in refusing it.

Let this be certified.

Error.                                        Reversed.